# UNITED STATES BANKRUPTCY COURT
### FOR THE EASTERN DISTRICT OF VIRGINIA
### NEWPORT NEWS DIVISION

In re:

**BRUCE E. & STEPHANIE B. STRACK,**                    **Case No. 05-53453-DHA**

       **Debtors.**                                           **Chapter 7**


**KUBOTA TRACTOR CORPORATION,**

      **Plaintiff,**

**v.**                                                           **APN 06-5002**

**BRUCE E. STRACK,**

      **Defendant.**

_____

## MEMORANDUM OPINION AND ORDER
_____


      This matter is before the Court on the plaintiff's Complaint to Determine

Dischargeability of Debt and to obtain a judgment against the debtor for the amounts due. The

Court is once again faced with the very difficult issue of whether to allow a debtor to discharge

debt he incurred when equipment obtained in a floor-plan agreement with the plaintiff-creditor

was sold but the proceeds from those sales were not turned over to the creditor.  The Court must

determine whether such debt should be excepted from discharge due to either defalcation by a

fiduciary pursuant to 11. U.S.C. § 523 (a)(4) or willful and malicious injury to another pursuant to subsection (a)(6) of that same statute.

This is a core proceeding over which this Court has jurisdiction under 28 U.S.C. §§ 157(b)(2) and 1334(b).  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  After taking the matter under advisement, we make the following Findings of Fact and Conclusions of Law.


## I.  FINDINGS OF FACT

On October 14, 2005, Bruce E. and  Stephanie B. Strack, filed for relief under Chapter 7 of the Bankruptcy Code.  The debtor listed the plaintiff on his Schedule F as a creditor holding an unsecured nonpriority judgment claim in the amount of $124,000.00.  The plaintiff filed this adversary proceeding on January 5, 2006.

The parties stipulated the following facts in this case:

1) Kubota Tractor Corporation ("KTC") and Enterprise Equipment, Inc., formerly known as Enterprise Ford Tractor, Inc. ("Enterprise") entered into a dealer sales and service agreement ("Agreement") dated September 29, 2003, which appointed Enterprise as an authorized dealer of Kubota products and gave Enterprise the right to purchase and resell those products at Enterprise's York County, Virginia retail facility.

2) The Agreement granted KTC a security interest in, and assignment of, the products sold to Enterprise.

3) Bruce E. Strack ("Strack" or "debtor") read, understood and signed the Agreement in his capacity as president of Enterprise, with full knowledge that Kubota-supplied equipment was collateral for the amounts due to Kubota under the Agreement.

2

4) Enterprise sold 27 pieces of Kubota equipment and did not pay the proceeds of those sales to KTC.

5) Debtor, as the president of Enterprise, intended for Enterprise to comply with the terms of the payment schedule to KTC on all Kubota-supplied equipment.

6) On January 13, 1999, the debtor signed a General Continuing Guarantee with KTC that continued his personal liability on Enterprise's indebtedness to KTC.

7)  KTC filed a Motion for Judgment in the Circuit Court of York County against the debtor and others.

7) On July 18, 2005, KTC was awarded a monetary judgment in the amount of $123,314.96 against the debtor (and others) in state court.

8) Charlie Byrom ("Byrom"), the Southeast Divisional Finance Manager for Kubota, received a letter from Irvine R. Spurlock ("Spurlock"), dated July 21, 2004, in which Spurlock offered to satisfy Enterprise's debt, up to $150,000, in exchange for a new Kubota-authorized dealership encompassing Enterprise's territory.

In addition to these stipulations, the following facts were proven at trial.  Enterprise sells farm and grass-cutting tractors and related equipment.  It has been in business for over 30 years and Strack has owned a portion of the company since December 1998.  Enterprise has been a Kubota dealer for 15 years and has conducted its business with KTC in the same manner during that entire time.

KTC sold equipment to Enterprise in two ways, parts were sold on open account and whole goods on a floor-plan arrangement.[1]  As for the whole goods, Enterprise's customers would typically finance their purchase through Kubota or another lender.  Enterprise pushed Kubota as a lender and in 2003 and 2004 Kubota financed approximately 70% and 50%, respectively, of Enterprises whole goods sales.

KTC conducted regular on-site inventory audits at Enterprise.  By Kubota's employee's own admission, Enterprise frequently had to settle its account at the conclusion of the audits, which Enterprise was able to do each time until March 2004.  At the conclusion of that audit, KTC determined that $100,000 of proceeds from the sale of Kubota equipment was due to KTC.  Enterprise did not have the funds immediately available and requested additional time to secure the money.  Several days later Enterprise sent a check to KTC, but the check did not clear the bank.  KTC then required that certified funds be provided to cover the amounts due and Enterprise obliged.  KTC continued to provide Enterprise whole goods on credit but required that Enterprise pay cash on delivery for parts, sales of which averaged between $5,000 and $10,000 each month.

In April 2004, KTC conducted another audit and determined that equipment worth $70,000-$80,000 had been sold by Enterprise without paying the proceeds to KTC.   Again Enterprise requested that it be given some time to provide the money to KTC, which KTC allowed.  Strack borrowed the money from friends and relatives and made payment to KTC.  KTC continued to provide equipment to Enterprise on credit and again in June or July 2004, a final audit by KTC discovered that Enterprise owed it almost $200,000 for equipment sold and

---

[1] Whole goods were defined during the trial as tractors or other equipment that were delivered to Enterprise fully

not paid for per the Agreement between KTC and Enterprise.   Enterprise was unable to pay this amount to KTC as it had in the past.  Strack testified Enterprises finances were such that any money coming in from the sale of equipment was being used to pay employees, taxes and any other expenses necessary for Enterprise to remain in business and pay its other creditors.

Enterprise's financial struggles began in 2001 with the recession. In 2002 there was a severe draught in Enterprise's business area, and finally in 2003 hurricane Isabel struck its market area.  While all of these events negatively impacted Enterprise's business, it was the last one that struck the hardest blow, as the Virginia Department of Transportation (VDOT), with whom Enterprise had a four year contract on which Branch Bank & Trust (BB&T) had extended Enterprise a line of credit, put a hold on all non-essential contracts.  Due to the hurricane the Governor of Virginia diverted funds from all available areas to disaster relief; therefore, Enterprise did not receive the purchase orders from the state for which it had contracted.  When VDOT finally resumed its ordering from Enterprise, it was too late financially, and Enterprise closed its doors before any of the orders could be delivered and any of the profits realized.

Strack and Brenton Staul ("Staul"), the Sales Manager at Enterprise, both testified that they tried every avenue available to maintain Enterprise as a going concern, including applying for loans and using their personal funds.  Strack even refinanced his home, borrowing against all of the equity and placed those funds in Enterprise's corporate account in an effort to keep the doors open.[2]  Additionally, Strack spent 50% of his time during early 2004 traveling, attempting to secure new contracts for Enterprise, which he testified did help the business's finances.

---

assembled and ready for sale and delivery to the customer.

5

Strack, Staul and KTC employees, Byrom and John Davidson ("Davidson"), all testified that Strack always fully intended to pay KTC the monies Enterprise owed to it.

In July 2004, KTC sent a letter to Enterprise demanding payment of approximately $190,000 for equipment sold by Enterprise.  Enterprise reduced that debt to approximately $124,000 by returning parts and accessories and making payments when funds were available. When Strack could find no other way to pay the remainder of the debt, he began looking for a buyer for Enterprise's Kubota dealership rights.  Specifically, Strack approached three people about purchasing the dealership, but only one, Spurlock, the owner of Middlesex Lawn & Garden Inc., was interested in buying it.[3]  Spurlock sent a letter, dated July 21, 2004, to Byrom, which memorialized Spurlock's and Byrom's previous discussions and offered to pay KTC up to $150,000 on Enterprise's debt in exchange for a new dealership encompassing Enterprise's territory.  The letter went on to state that it was Spurlock's "desire for Enterprise Equipment's obligations to Kubota to be completely fulfilled….We believe that if all parties work diligently and cooperate fully that this debt can be retired completely."  Pl. Ex. C.  On that same day, July 21, 2004, KTC provided forms to Enterprise, which were completed by Strack that terminated Enterprise's Agreement with KTC.  Byrom testified that it was KTC's objective to get Enterprise to sign the dealer termination document during KTC's July 2004 site visit to Enterprise.[4] Byrom and Davidson were present at Enterprise at least toward the end of the visit.  Strack

---

[2] This money, however, was used to pay another creditor, New Holland, for its equipment in an effort to fulfill VDOT's renewed purchase orders.  As discussed *infra* Strack thought Enterprise's debt to KTC had been taken care of through a sale of the KTC dealership to Spurlock.

[3] Spurlock made a prior inquiry to KTC about purchasing a dealership, but was turned down by KTC because Enterprise would not consent, a right it had pursuant to the Agreement.

[4] After the final audit in June or July 2004, KTC sent several employees to Enterprise's location in an effort to ensure that KTC was paid.  One of KTC's employees actually stayed on site for several weeks and was even provided a desk and telephone so he could conduct business there.

testified that Byrom told him that KTC could not accept Spurlock's letter as a resolution to Enterprise's debt, unless Enterprise would sign the dealer termination document; conversely Strack told Byrom that he would not sign the dealer termination document unless and until KTC accepted Spurlock's offer. Strack testified that he was then presented with KTC's dealer termination document and another KTC form, a corporate resolution form that authorized Strack's signing of the dealer termination form. Strack testified that he signed both documents and that his purpose in doing so was "to make everything official." Strack then testified that he felt "utter relief" after signing the documents, that he thanked the KTC employees for allowing him time to work out a deal that satisfied his debt, and that he shook hands with all of them as they left Enterprise for the last time. Strack testified that he felt at that time that his debt with KTC was settled as all Kubota product had been removed by KTC from Enterprise's location and he did not hear anything from KTC for months.

Strack first learned that something was amiss in his deal with KTC and Spurlock several months later when he received a notice from KTC stating that he still owed KTC money for the equipment. Strack consulted with Spurlock, who told him that he was awaiting a final contract from KTC to finalize the deal. Strack later learned that a contract had been sent to Spurlock, but that he would not sign it.

Ultimately, KTC sued the debtor and several others for the balance due under the Agreement and obtained a judgment for $123,914.96. In Enterprise's and Strack's grounds for defense to the KTC claim, Strack stated that the money was a legitimate debt. Strack testified that he admitted the legitimacy of the debt in the grounds for defense out of a moral obligation even though he thought he had taken care of the debt through his deal with Spurlock and KTC.

He stated that the money was owed and if Spurlock was not going to pay it, then he felt that he

had to, but that those answers do not negate his testimony about his deal with Spurlock and KTC.

At the conclusion of the plaintiff's case-in-chief and at the end of the trial, the debtor

moved for Judgment on Partial Findings on both counts of the plaintiff's complaint pursuant to

F.R.B.P. 7052(c).  As to the § 523(a)(4) allegation, the debtor argued that the case law, as

established by the United States Supreme Court in *Davis v. Aetna Acceptance Co.*, 293 U.S. 328,

(1934), precludes the finding of a fiduciary or trust relationship in floor-plan agreements, such as

the one in the instant case, where there is no other evidence of a trust.  Regarding the § 523(a)(6)

theory, the debtor argued that the plaintiff failed to prove that the debtor engaged in willful and

malicious conduct and therefore, he is entitled to judgment on both counts.

## II. CONCLUSIONS OF LAW

Discharge in bankruptcy is intended to allow debtors a fresh financial start; however in

11 U.S.C. § 523 Congress allowed certain debts to be excepted from discharge.  *E.L. Hamm &*

*Assoc., Inc. v. Sparrow (In re Sparrow)*, 306 B.R. 812, 823 (Bankr. E.D. Va. 2003). Given the

overarching goal of bankruptcy, though, these exceptions are to be construed narrowly, except in

cases of fraud.  *Foley & Lardner v. Biondo (In re Biondo)*, 180 F.3d 126, 130 (4th Cir. 1999).

The exceptions at issue here are §§ 523(a)(4) and (a)(6), which read:

> (a)  A discharge under section 727…of this title does not discharge
> an individual debtor from any debt—
>> (4) for fraud or defalcation while acting in a fiduciary capacity,
>> embezzlement, or larceny;
>> …
>> (6) for willful and malicious injury by the debtor to another
>> entity or to the property of another entity.

11 U.S.C. §§ 523 (a)(4) & (a)(6) (2006).  The plaintiff bears the burden to prove the debt at issue

in this case is non-dischargeable by a preponderance of the evidence.  *Grogan v. Garner*, 498

U.S. 279, 291 (1991); *KMK Factoring, L.L.C. v. McKnew (In re McKnew)*, 270 B.R. 593, 617

(Bankr. E.D. Va. 2001).

**523(a)(4)**

KTC seeks to have a judgment it won against the debtor in state court in the amount of

$123,914.96 declared non-dischargeable because it claims there was an express trust between the

parties based on the following language in the Agreement:  "Until Dealer shall have made

settlement with KTC of the full amount due to KTC with respect to any Collateral disposed of by

Dealer, Dealer shall segregate the proceeds and hold the same in trust for KTC."[5]  Thus, KTC

argues that Enterprise had a fiduciary duty to protect the proceeds from the sale of equipment

and parts until such time that those monies were paid to KTC and that Strack, as Enterprise's

president, breached that fiduciary responsibility; as a result the debt should not be forgiven.

In order to except a debt from discharge based on fraud or defalcation of a fiduciary's

duties, there must be an express trust.  *Davis v. Aetna Acceptance Co.,* 293 U.S. 328, 333 (1934);

*Chapman v. Forsyth,* 43 U.S. (2 How.) 202 (1844); *In re Sparrow,* 306 B.R. 812, 827 (Bankr.

E.D. Va. 2003); *In re Holmes,* 117 B.R. 848, 853-54 (Bankr. D. Md. 1990); *In re Lewis,* 94 B.R.

406, 409 (Bankr. E.D. Va. 1988).  As this Court has previously pointed out, "the term 'fiduciary'

as used in § 523(a)(4) refers to 'the class of fiduciaries including trustees of specific written

declarations of trust, guardians, administrators, executors or public officers and, absent special

---

[5] In the Agreement Enterprise is defined as the Dealer.

considerations, does not extend to the more general class of fiduciaries such as agents, bailees,

brokers, factors and partners.'"[6] *Sparrow,* 306 B.R. at 828 (quoting *In re Lewis,* 94 B.R. 406, 410

(Bankr. E.D. Va. 1988). Therefore, the only way the plaintiff can prevail is if the parties created

an express trust.

The United States Supreme Court in *Davis*, decided that in a situation very similar to the

one at bar, an express trust was not created by a floor plan agreement. *Davis*, 293 U.S. at 333-34;

*American Honda Finance Corp. v. Francis*, No. 92-0085-B, 1993 U.S. Dist. Lexis 442, *9

(Bankr. W.D. Va. Jan. 14, 1993) (holding, however, that a fiduciary relationship did exist

between the debtor and creditor because further defalcations occurred *after* the debtor filed

bankruptcy at which time the debtor had a fiduciary obligation under bankruptcy law to the

creditors of the estate).  In *Davis*, the debtor was an automobile dealer, who borrowed money

from the lender in order to purchase an automobile to resell at his retail showroom.  *Id.* at 330.

---

[6] *Sparrow* continues :

> It appears the Fourth Circuit Court of Appeals has not weighed in on this distinction in
> any published decision. However, in two unpublished decisions, the Fourth Circuit has
> endorsed the notion that an express or technical trust must arise to impose liability under
> § 523(a)(4). *See Bradley v. Kelley (In re Kelley),* 948 F.2d 1281 (4th Cir.
> 1991)(unpublished table decision)(holding that since Virginia statute did not create a trust
> res or impose trust responsibilities, debtor who was president of company issuing
> defaulted securities was not in fiduciary relationship); and *Harrell v. Merchant's Express
> Money Order Co. (In re Harrell),* 173 F.3d 850 (4th Cir. 1999)(unpublished table
> decision)(holding that "under this section [523(a)(4)], a fiduciary is limited to instances
> involving express or technical trusts."); *But see Airlines Reporting Corp. v. Ellison (In re
> Ellison),* 296 F. 3d 266, 271 (4th Cir. 2002)("Based on the confluence of: (1) the
> [debtor's] personal guarantees to ARC [the creditor] of Sovereign Travel [the debtor's
> corporation] indebtedness; (2) the fact that Sovereign Travel's indebtedness arose from
> Sovereign Travel's breach of its fiduciary duty to ARC; (3) the fact that Sovereign
> Travel's breach of a fiduciary duty was brought about by the Ellison's personal conduct
> and (4) the fact that the Ellison's conduct amounted to a breach of their fiduciary duty to
> Sovereign Travel, we conclude that the Ellison's indebtedness to ARC under the personal
> guarantees was from their defalcation while acting in a fiduciary capacity and therefore is
> not dischargeable in bankruptcy under 11 U.S.C. § 523(a)(4)").

The lender was given a security interest in the automobile as collateral for the loan. *Id.*  Several documents were completed as part of the transaction; a promissory note, a chattel mortgage for the automobile, a bill of sale, and a trust receipt, which acknowledged receipt of the car and bound the dealer to hold the car as property of the lender "for the purpose of storage, and not to sell, pledge or otherwise dispose of [the car] except upon consent" of the lender. *Id.*  The dealer later sold the car without the lender's consent and failed to remit the proceeds from the sale to the lender. *Id.*  The court held that it could not focus exclusively on the "trust receipt" to find a trust, as argued by the lender, but rather had to look at the documents collectively to determine the true nature of the transaction. *Id.* at 334.  The court found that all the lender truly held was a security interest in the automobile and that the "resulting obligation is not turned into one arising from a trust because the parties to one of the documents have chosen to speak of it as a trust." *Id.*

While the parties' transaction in the instant case is memorialized in one versus multiple documents, the law in *Davis* is still applicable.  KTC points to one word in the sixteen page Agreement and asks this Court to determine that the use of that word creates an express trust. While the Court acknowledges that the Agreement does state that the proceeds from the sale of KTC collateral will be held in trust, Agreement, p. 3, ¶ 4F, finding a trust based solely on that one expression without looking to the rest of the document is in contradiction to the holding in *Davis*.  Looking to the remainder of the Agreement we find that it also states that all product and inventory is sold from KTC to Enterprise, *Id.* at p. 2, ¶ 4B, and calls Enterprise the buyer and KTC the seller. *Id.* at p. 6, ¶ 11.  As title is not addressed specifically in the Agreement, it can be

inferred from the use of these terms that title to the equipment and parts transferred to Enterprise.

Bolstering this inference is the plain language of the Agreement, which clearly states that KTC

takes a security interest in the products and inventory, *Id.* at p. 2, ¶ 4B and states what must occur

for that security interest to be protected and perfected. *Id.* at p. 3, ¶ 4C.  Taking all of these terms

of the Agreement together, we are left with a situation identical to that in *Davis*, a debtor who

owns the collateral and a creditor who merely has a security interest in it.  Consequently, the

outcome must be the same.  This was not a trust relationship and therefore the debtor could not

have breached any fiduciary duty to KTC, and § 523(a)(4) is not applicable in this case.


**523(a)(6)**

Bankruptcy Code § 523 (a)(6) excepts from discharge any debt incurred as a result of a

"willful and malicious injury by the debtor to another entity or to the property of another entity."

11 U.S.C. § 523(a)(6).   "[A]n act of conversion [falls]…within the scope of this exception."

*Davis*, 293 U.S. at 332; *Thompson v. Brookshire (In re Brookshire)*, No. 05-51091, APN 05-

6022, 2006 Bankr. Lexis 57, at *13 (Bankr. M.D.N.C. Jan. 10, 2006).

The Court notes that the test to determine dischargeability under this Code section is a

two-part test; the injury must be both willful and malicious, and if either element is not present

the debt is dischargeable.  The Court will address each in turn.

The determination of a "willful" injury changed dramatically in 1998 with the United

States Supreme Court's decision in *Kawaauhau v. Geiger*, 523 U.S. 57 (1998).[7]  Prior to the

---

*Sparrow,* 306 B.R. at 828.
[7] See *Dominion Virginia Power v. Robinson (In re Robinson)*, 340 B.R. 316, 331-37 (2006) for a thorough discussion of *Geiger*, its predecessors and post-*Geiger* opinions.

ruling in *Geiger*, as this Court has previously noted, to prove that an injury was willful a

"creditor was only required to show the debtor's act was intentional; there was no requirement to

show that the injury was intended." *Branch Banking and Trust Co. of Va., Inc. v. Powers (In re*

*Powers)*, 227 B.R. 73, 75 (Bankr. E.D. Va. 1998) (citing *Britton v. Price (In re Britton)*, 950

F.2d 602, 605 (9th Cir. 1991).  The *Geiger* court, however, found that "the word 'willful' in

(a)(6) modifies the word 'injury,'" which necessarily means that the debtor must intend to cause

the injury itself and not just intend to commit an act that happens to cause injury.  *Geiger*, 523

U.S. at 61-62.  The court came to this conclusion, in part, by noting that Congress could have

used the words "'reckless' or 'negligent,' to modify 'injury,'" but chose instead the word

"willful."  *Id.* at 61.  This same standard applies to conversion cases.  *See Geiger*, 523 U.S. at 63-

64 (citing with approval two of its previous decisions in conversion cases, *Davis v. Aetna*

*Acceptance Co.*, 293 U.S. 328 (1934) and *McIntyre v. Kavanaugh*, 242 U.S. 138 (1916));

*McKnew*, 270 B.R. at 635.

Courts, however, have had a difficult time ascertaining the actual injury and the

accompanying intent in conversion cases.  One court noted that conversion seems to straddle the

line between intentional tort and reckless or negligent tort, making it difficult to fit "neatly into

either…categor[y]." *Haemonetics Corp. v. Dupre*, 238 B.R. 224, 230 (Bankr. D. Mass. 1999).

Another court declared the injury in conversion cases to truly exist only in the abstract, it being a

violation of rights.  *ABF, Inc. v. Russell (In re Russell)*, 262 B.R. 449, 454-55 (Bankr. N.D. Ind.

2001).  In fact, the court in *ABF* analogized this violation to the one that occurs in an assault and

battery.  *Id.* at 454. The court states that the broken jaw that occurs during the assault and battery

is not the injury, but rather the violation of the victim's right to be free from unauthorized

13

touching. *Id.*  The problem this Court sees with analyzing conversion in this manner, at least in

Virginia, is that it does not comport with the definition of conversion.

In Virginia "[c]onversion is the wrongful assumption or exercise of the right of

ownership over goods or chattels belonging to another in denial or inconsistent with the owner's

rights." *Economopoulos v. Kolaitis*, 259 Va. 806, 814 (2000).  In lay terms, converting property

means refusing to return it to its rightful owner.  According to this definition, the injury is not

abstract, but rather very real. The question to determine dischargeability becomes, did the debtor

intend to keep the property from its rightful owner?

One of the problems that arise in answering that question is the issue of timing; to what

period of time should the Court look?  If the Court looks at merely one snapshot of time, then the

debtor may be guilty of a technical conversion; however, the Supreme Court has previously ruled

that a technical conversion does not equate to non-dischargeability as it is "done without

willfulness or malice." *Davis*, 293 U.S. at 332.  This Court finds that in conversion cases, you

must look past that one moment in time in order to decipher the debtor's ultimate intent with

regard to the property. It is not enough for the debtor to simply say that ultimately he intended to

return the property; he must have some reasonable expectation that he will be able to do so.

Some may argue that every debtor will say that he intended to return the property, but

this argument is not persuasive as courts have experience dealing with less than honest

witnesses.  Judges have to be very discerning, determining the weight and credibility to ascribe

to the testimony of a witnesses and will continue to do so by reconciling it with the evidence,

facts and circumstances in the case.  Additionally, the reasonableness requirement acts as a

backstop against not only dishonest debtors, but also honest ones with unrealistic intentions.

The malice element of § 523(a)(6) was not discussed in *Geiger* and has not changed since previous rulings of this Court.  As noted in *Johnson v. Davis (In re Davis)*, 262 B.R. 663,

> Malice does not mean the same thing for nondischargeability purposes under § 523(a)(6) as it does in contexts outside of bankruptcy. In bankruptcy, debtor may act with malice without bearing any subjective ill will toward plaintiff creditor or any specific intent to injure same. See In re Stanley, 66 F.3d at 667, citing St. Paul Fire & Marine Ins. Co. v. Vaughn, 779 F.2d 1003, 1008-09 (4th Cir. 1985). The Fourth Circuit defines malice as an act causing injury without just cause or excuse. See In re Powers, 227 B.R. at 73.

> Debtor's subjective mind set is central to the inquiry as to whether debtor acted deliberately in knowing disregard of a creditor's rights in property. In fact, a plaintiff creditor can even establish malice on an implied basis from a showing of debtor's behavior, as well as a presentation of the surrounding circumstances. See St. Paul Fire & Marine Ins. Co., 779 F.2d at 1010 ("implied malice, which may be shown by the acts and conduct of the debtor in the context of their surrounding circumstances, is sufficient under ... § 523(a)(6)."); Hagan v. McNallen (In re McNallen), 62 F.3d 619, 625 (4th Cir. 1995). What is required is that plaintiff prove that debtor's injurious act was done deliberately, intentionally and with knowing disregard for plaintiff's rights. See In re Stanley, 66 F.3d at 667.

*Johnson v. Davis (In re Davis)*, 262 B.R. 663, 670-71 (Bankr. E.D. Va. 2001); *see also Robinson*, 340 B.R. at 337; *Beckett v. Bundick (In re Bundick)*, 303 B.R. 90, 109-110 (Bankr. E.D. Va. 2003); *McKnew*, 270 B.R. at 640.

It is against this legal canvas that the Court must apply the facts of this case.    There is no dispute in this case that the debtor intended to pay KTC for the equipment that was sold through Enterprise.  Indeed, the plaintiff both stipulated to and testified to that fact at trial.  The debtor's conduct is congruous with that testimony, as well.  The debtor reduced the original debt from $190,000 to approximately $124,000 by making payments and returning parts to KTC. Additionally, the debtor spent half of his time soliciting more business to put Enterprise in a position to repay the money.  The debtor reduced staff and office space, and made every attempt

to fulfill an order from VDOT that would have allowed for positive cash flow, all in an attempt to repay KTC and other creditors.  But perhaps most telling of all is the fact that the debtor thought he had made arrangements with Spurlock for a buyout of his Kubota dealership that would have paid the balance of the debt.  The Court found the testimony and the evidence on this point most persuasive.  Given all of these undisputed facts in the case, the Court finds that debtor's ultimate intent was to pay KTC and that his belief in his ability to be able to do so was reasonable.  In fact, the failure of KTC's ultimate deal in granting to Spurlock Enterprise's former sales area to extinguish the Enterprise debt to KTC was not explained by the evidence. That deal should have canceled the balance of Enterprise's debt by Spurlock's agreement to pay the same in his letter of July 21, 2004 to Byrom.

It is unnecessary for the Court to address the issue of maliciousness as the first part of the test in § 523(a)(6) is not met.  The plaintiff has failed to meet its burden of proof on this issue; therefore the debt is dischargeable as it does not meet the requirements of the exception from discharge found in § 523(a)(6).

## CONCLUSION

We have determined that the following resolution of the issues presented is appropriate under the facts of this case and the law as applied to those facts:

1. Debt incurred through a floor plan financing arrangement, such as the one between the plaintiff and defendant-debtor in this case, does not qualify as a trust; therefore, the exception to discharge enumerated in § 523(a)(4) is not applicable.

2. Plaintiff has failed to prove that the defendant-debtor's actions were willful as

16

required by § 523(a)(6) to be excepted from discharge; therefore the judgment debt of

$123,914.96 against the debtor is dischargeable.


**IT IS SO ORDERED.**


Newport News, Virginia
October 4, 2006

_____
DAVID H. ADAMS
United States Bankruptcy Judge

Copies to:
        Dennis Lewandowski, Esq.
        Carolyn L. Camardo, Esq.
        David R. Ruby, Trustee